IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| EARNIE B. FARR | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-10-205 |
| | § | |
| | § | |
| MICHAEL ASTRUE, COMMISSIONER | § | |
| OF SOCIAL SECURITY ADMIN. | § | |

## OPINION AND ORDER

Before the Court, with the consent of the parties, is Plaintiff Earnie B. Farr's action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of a final decision of the Commissioner of the Social Security Administration denying his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et. seq.*, and for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381 *et. seq.* A Motion for Summary Judgment was filed by Plaintiff (Docket Entry (Dkt.) No. 11) and by the Commissioner. (Dkt. Nos. 12, 13). Having reviewed the competing motions, the Plaintiff's response (Dkt. No. 14), the administrative record and applicable law, the Court enters this opinion and order.

## I. INTRODUCTION

Plaintiff Earnie B. Farr (Farr) brings this action pursuant to § 205(g) of the Social Security Act (Act), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration (Commissioner) denying his application for disability insurance

1

benefits (DIB) and for supplemental security income (SSI).  Farr contends that, for numerous

reasons, substantial evidence does not support the decision of the Administrative Law Judge (ALJ)

and that the ALJ committed errors of law.  (Dkt. No. 11 at 4-12).  Farr moves the Court for an

order reversing the Commissioner's decision and remanding his claim for further proceedings or,

in the alternative, awarding benefits.  (*Id*. at 12-13).  The Commissioner responds that substantial

evidence supports the ALJ's decision, the decision comports with applicable law, and that it

should, therefore, be affirmed.  (Dkt. Nos. 12, 13).

## II.  REVIEW OF ADMINISTRATIVE BENEFITS

### A.  Statutory Bases for Benefits

Under the Social Security Act, DIB and SSI are separate and distinct programs.  42 U.S.C.

§§ 401 *et. seq.*, 1381 *et. seq.*  Nevertheless, applicants seeking benefits under either statutory

provision must prove "disability" within the meaning of the Act, which defines disability in

virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3),

1382(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is

defined as the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42

U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the

determination of disability are the same for both DIB and SSI.  *See Greenspan v. Shalala*, 38 F.3d

232, 236 (5th Cir. 1994).

### B.  Standard of Review for Administrative Determinations

A federal court reviews the Commissioner's denial of benefits only to ascertain whether

(1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 472, 473 (5th Cir. 1999); *see also*, 42 U.S.C. § 405(g) (2000).[1] "Substantial evidence," as defined in the Act, means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). If the Commissioner's findings are adjudged to be supported by substantial evidence, then such findings are conclusive and must be affirmed. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). A court does not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *Id*. Conflicts in the evidence are for the Commissioner, not the Court, to resolve. *Brown*, 192 F.3d at 496.

### C. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[1] Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g) (2000).

be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§ 423(d)(1)(A) (2000).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3) (2000).  The impairment must be so

severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2000).  The mere presence of an impairment is not enough to establish

that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of

engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir.

1992)(quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

The Commissioner applies a five-step sequential process to determine disability status:

> 1. If the claimant is presently working, a finding of "not disabled" must
> be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of
> impairments, he will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment
> listed in Appendix 1 of the Regulations, disability is presumed and benefits
> are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of
> "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents him from doing any other
> substantial gainful activity, taking into consideration his age, education,
> past work experience, and residual functional capacity, he will be found
> disabled.

4

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5ᵗʰ Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5ᵗʰ Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5ᵗʰ Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

## III.  FARR'S ADMINISTRATIVE PROCEEDINGS

In the present case, Plaintiff Earnie Farr submitted an application for DIB and SSI benefits with the Social Security Administration (SSA) on June 6, 2008 and October 6, 2008, claiming that he has been disabled and unable to work since August 30, 2007, as a result of a right arm/hand/wrist injury, neck and back problems due a herniated disc, torn cartilage in his shoulder, rheumatoid arthritis, hypertension and a recent diagnosis of bipolar disorder.  (Tr. at 128, 139, 145).[2]  At the time he filed his application, Farr was almost forty-five years old (born 07/13/1963).  (Tr. 113).  Farr attended school through the eighth grade and, while placed in special education classes, he never learned to read or write and remains, to this day, illiterate. (Tr. 116, 121).  He listed his prior work experience as a framer for a construction company from 1996 to 2000, and a city maintenance worker from 2001 to 2002 and then from 2005 to 2006.

---

[2] "Tr." refers to the transcript of the administrative record.

(Tr. 117-18). Farr's DIB and SSI claims were denied initially and also upon reconsideration. (Tr.

31-34). Farr then requested a hearing before an ALJ. (Tr. 62-65; 70-71).

     A hearing was held on August 5, 2009, at which time the ALJ heard testimony from Farr

and Wallace Stanfill, a vocational expert (VE). (Tr. 9-30). Farr was represented at the hearing

by attorney Michael Makris. (Tr. 9, 11). As reflected in his written decision dated October 19,

2009, the ALJ, after considering the entire record, made the following determinations concerning

Farr:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since August 30, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: post surgical upper extremity fracture. (20 CFR 404.1520(c) and 416.920(c)).

    \*  \*  \*

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

    \*  \*  \*

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

    \*  \*  \*

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

    \*  \*  \*

7.    The claimant was born on July 13, 1963 and was 44 years old,
      which is defined as a younger individual age 18-49, on the alleged
      disability onset date. (20 CFR 404.1563 and 416.963).8.

8.    The claimant is illiterate and is able to communicate in English (20
      CFR 404.1564 and 416.964).

          *    *    *

9.    Transferability of job skills is not an issue in this case because the
      claimant's past relevant work is unskilled (20 CFR 404.1568 and
      416.968).

10.   Considering the claimant's age, education, work experience, and
      residual functional capacity, there are jobs that exist in significant
      numbers in the national economy that the claimant can perform (20
      CFR 404.1569, 404.1569a, 416.969, and 416.969a).

          *    *    *

11.   The claimant has not been under a disability, as defined in the
      Social Security Act, from August 30, 2007 through the date of this
      decision (20 CFR 404-1520(g) and 416.920(g)).

(Tr. 35-45). Thus, the ALJ denied Farr's applications for benefits on October 19, 2009. (Tr. 45).

Farr appealed the ALJ's decision to the Appeals Counsel of the SSA's Office of Hearings and Appeals. (Tr. 6-8). On March 22, 2010, the Appeals Council, having reviewed the ALJ's decision and the brief submitted by Farr's representative, denied Farr's request for review. (Tr. 1-5). The decision of the ALJ thereby became the final decision of the Commissioner, and it is from this final decision that the appeal (Dkt. No. 1) has been taken pursuant to 42 U.S.C. § 405(g).

The evidence is set forth in the transcript, pages 1 through 287. There is no dispute as to the facts contained therein.

## IV. ISSUES PRESENTED

Farr contends that the ALJ's determination is flawed for several reasons which he has delineated as follows: (1) the ALJ improperly relied on the VE's testimony when it conflicted with the Dictionary of Occupational Titles (DOT) and was not supported by the record; (2) the ALJ found that Farr was capable of performing work at a light exertional level, however, he erred by failing to incorporate consideration of his reduced bilateral manual dexterity when determining his RFC; (3) the ALJ failed to acknowledge certain evidence favorable to Farr; (4) the ALJ improperly discounted Farr's credibility and found him capable of performing work at a light exertional level based only on his ability to perform limited activities of daily living (ADL); (5) the ALJ failed to obtain an updated opinion from a medical expert as to the medical equivalency of Farr's combined impairments and failed to consult with a medical expert concerning Farr's RFC; (6) the ALJ failed to develop the case when he did not obtain an updated medical expert opinion; (7) the ALJ failed to address Farr's illiteracy and its effect on the job base; (8) the ALJ determined Farr's testimony not credible, but then engaged in "picking and choosing" testimony upon which to deny benefits; (9) the ALJ failed to consider the non-exertional impairments of pain and its consequent functional limitations when determining Farr's RFC and then improperly relied on this determination when posing incomplete hypothetical questions to the VE; and (10) the ALJ failed to determine whether Farr could maintain employment. (Dkt. No. 11 at 4-12).[3]

---

[3] Despite the numerous grounds Farr raises, the Court observes that most of his claims involve matters related to the ALJ's determinations at steps 4 and 5.

8

## V.  DISCUSSION

When considering the numerous issues presented, this Court's review is limited to considering whether the proper legal standards were applied and whether the decision was supported by substantial evidence. In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren,* 925 F.2d at 126. To the extent they exist, any conflicts in the evidence are to be resolved by the ALJ and not by the Court. *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### A.  Objective Medical Evidence and Opinions of Physicians

#### 1.  The Treating Doctors

Farr's medical records, which were considered by the Commissioner and are part of the administrative record,[4] reflect that in August 2003, Farr sustained a "massive polytrauma" to his upper extremity when a tire he was inflating blew off the rim and struck him. (Tr. 169, 188, 193). Farr, who is right-hand dominant, suffered severely comminuted fractures to his right arm/wrist in the incident. (*Id*). In August, Farr underwent surgery at Herman Hospital in Houston, Texas, to repair the fractures, but, because the fractures were not healing well, he later had to undergo a second surgery at this hospital in late October 2003.[5]

---

[4] The Court pauses to note that it was dismayed to find another individual's medical records included in this administrative record. (Tr. 162-163).

[5] The medical records from Herman Hospital were not contained in the administrative record, thus, any reference to the accident, the resulting injury, and the surgeries were derived by the Court from Farr's subsequent medical records.

The records reflect that following his first surgery, Farr was seen in the Emergency Room (ER) of the University of Texas Medical Branch in Galveston (UTMB) on October 14, 2003, due to his complaints of increased pain in his right wrist/arm. (Tr. 173-174). According to the records, Farr explained that he was given Vicodin after the surgery to manage the pain, but that he had run out of this medication and was still experiencing significant pain. Farr also explained that he was supposed to be undergoing an additional surgery, but that he had not yet been informed when it would be scheduled. (Tr. 173). Following the examination, the doctor diagnosed Farr with multiple fractures to his right forearm and wrist, prescribed Vicodin for the pain and advised him to follow-up with the orthopedic department. (Tr. 174).

On November 16, 2003, after undergoing a second surgery, Farr went to the ER at UTMB with complaints of drainage and swelling in his right wrist and hand and pain in his right arm and shoulder. (Tr. 171). The doctor diagnosed Farr with right arm pain. Farr was released from the ER with prescriptions for antibiotics and pain medication, an ace bandage and sling for comfort and he was advised to follow-up with the orthopaedic clinic. (Tr. 172).

Farr made an appointment and, approximately one month later, he was seen by a doctor in UTMB's Department of Orthopaedics and Rehabilitation. (Tr. 169-170). Upon examination, Dr. Stewart found the following:

> [t]he patient has extreme stiffness of the right upper extremity. All digits are extremely stiff with virtually no passive motion to the right hand fingers with competent digital flexion of less than 10 degrees for all digits including the thumb. The wrist is also similarly very stiff with accomplished motion arch of flexion 10 degrees and the elbow has an arch of motion of approximately 30 degrees. The elbow is also stuck rotationally in slight pronation and has only approximately a 10 degree rotational arch.

(Tr. 169). In addition, he noted that, based on the x-rays, the distal radius did "not appear to be completely healed and [Dr. Stewart opined that] there may be mal-union as well and some incongruity, but at this point this is a secondary concern in relation to [Farr's] very severe arthrofibrosis." (Tr. 169). Dr. Stewart diagnosed Farr with "polytrauma to right upper extremity with severe arthrofibrosis"[6] and, while advising Farr that it was likely that he would have to undergo an additional surgery in the future, he referred Farr to the occupational therapist and recommended that he undergo several weeks of physical and occupational therapy. (Tr. 169). As directed by Dr. Stewart, Farr saw an occupational therapist at UTMB and he was told that the goal would be increasing the range of motion in his right elbow, wrist and fingers. (Tr. 168).

On January 14, 2004, approximately one month after seeing Dr. Stewart, Farr returned to UTMB's orthopaedic clinic. According to the records, Farr explained that he had not been able to return until today due to difficulties in obtaining transportation to Galveston from his home in Angleton. (Tr. 166, 186-187). The doctor examined Farr and noted his findings as follows:

> [t]he patient has extreme stiffness in his digits with his PIP locked at 90 degrees, his wrist is locked at 5 degrees of flexion and can flex down to 20 degrees with a 15 degree range of motion. He has severe contracture that cannot passively be extended. He has tenderness to palpitation in his distal radius but no tenderness to palpitation in is ulnar. He has a palpable radial pulse. His median, radial, and ulnar nerves are intact with respect to both motor and sensory.

(Tr. 166). The doctor also ordered x-rays which revealed that Farr's ulnar fracture was "well-healed with hardware in place and no loosening of the screws or plates." (Tr. 166, 186-187). The treating physician diagnosed Farr with "poly trauma to his right upper extremity and severe

---

[6] "Arthrofibrosis represents a severe complication in joints after trauma and surgery, with loss of motion due to an excessive fibrotic response to the repair process." Http://ncbi.nlm.nih.gov/pubmed/12426757.

flexion contracture" and stressed to Farr the importance of obtaining aggressive physical therapy. (Tr. 166).

As reflected in the administrative record, it appears that Farr did not seek medical treatment again until September 3, 2004. On that date, Farr presented at the ER at UTMB with complaints of pain in his chest, abdomen and left lower back (Tr. 164), as well as diarrhea lasting two weeks. (Tr. 165-165). The treating physician ordered blood work, but the results were found to be mostly normal. (Tr. 184-185). The doctor diagnosed Farr with "abdominal pain," prescribed him medication and instructed him to follow-up with a gastroenterologist. (Tr. 165).

On September 30, 2004, Farr returned to the ER at UTMB with complaints of an abrasion on his right buttocks, swelling in his left hand, and pain in his neck and shoulder. (Tr. 160-161). The doctor diagnosed Farr with cervical strain and an abscess on the left hand, 4th digit and the right buttock and provided him with a prescription for an antibiotic, ibuprofen and pain medication. (Tr. 161).

On December 29, 2004, Farr returned to the orthopaedics clinic at UTMB for a follow-up visit and to obtain a "work release" form. (Tr. 158). The notes reflect that Farr reported that, since last being seen, he had been engaged in "performing self-directed therapy in his right upper extremity and has had significant improvement with regard to motion in his extremity and his hand," and that he took "occasional anti-inflammatories for pain, [but was] otherwise, [he] is doing well." (Id.). Upon examination, the doctor noted that Farr had well-healed surgical scars; and, in terms of range of motion, he noted:

> [Farr] has full shoulder elevation. He has range of motion of the elbow from -10 to 120 degrees flexion. He has 45 degrees supination and 70 degrees forearm pronation, wrist extension of 5 degrees, and 25 degrees of flexion. He has evidence of clawing of the ulnar 3 digits of the right hand.

12

> He does have a flexion contracture of approximately 45 degrees at the third, fourth and fifth MCP joints with flexion to approximately 80 degrees. He is -1.5 cm complete composite flexion and fist formation. The sensation is intact to all fingers. He has some atrophy of the instrinsic musculature. He has good grip strength 2+ radial pulses with capillary refill.

(*Id.*). The doctor diagnosed Farr with "significant right forearm polytrauma with open reduction and internal fixation of a left open proximal ulnar fracture and right distal radius fracture and posttraumatic clawing of the hand and intrinsic contracture."[7] (*Id.*). The doctor provided Farr, as he had requested, with a return to work slip with no restrictions noted and encouraged him to continue in his "self-directed therapy." (Tr. 158-159).

Approximately three months later, Farr went to the ER at UTMB for muscle aches, shortness of breath and pain with coughing. (Tr. at 156-157). Farr was diagnosed with acute pharyngitis and bronchitis. The doctor prescribed medication and he was released. (Tr. 157).

On March 11, 2005, less than two weeks after being seen at UTMB's ER, Farr was seen at the Brazosport ER for complaints of tenderness and pain in his right wrist/arm. (Tr. 281-287). Farr explained that the pain had increased over the last few days, but he denied that it was the result of any new injury. (Tr. 285). Farr was diagnosed with post-surgical arm pain, he was provided with a few days of pain medication, and he was directed to follow-up with his family doctor. (Tr. 287).

---

[7] Intrinsic contracture is where "[t]he hand assumes a typical position with flexion of the metacarpophalangeal joints and extension of the interphalangeal joints. The thumb may be involved, and may exhibit marked flexion of the metacarpophalangeal joint and hyperextension of the interphalangeal joint. The loss of function is considerable, – the patient loses the essential functions of pinch and grasp." The Journal of Bone & Joint Surgery, Vol. 36, Issue 1,C. Harris and D. Riordan, "*Intrinsic Contracture in the Hand and its Surgical Treatment*" (Jan. 1, 1954) [http://jbjs.org/article.aspx?articleleid=11802).

The records do not reflect that Farr sought medical attention for his arm/wrist/hand again until May 5, 2007.[8] On this date, Farr went to the Angleton Danbury Medical Center (ADMC) after burning his right hand. (Tr. 229-233). The records also reflect that Farr complained that he had been experiencing headaches and neck pain for past three weeks. (Tr. 229). Upon examination, the doctor noted that Farr had "contracture flexion to [his] # 5,4,3 [right] fingers," and determined that Farr sustained second degree burns to the dorsum area of his right hand. (Tr. 232). After his injury was cleaned, treated and dressed, Farr was discharged. (*Id.*).

Thereafter, the records before the Court reflect that Farr was seen in different emergency rooms for complaints of abdominal pain, but none of these visits appear to involve complaints of pain concerning his arm/wrist/hand, neck or back. (Tr. 217-228; 152-155; 245-256). Farr's lack of complaints, at least with regard to his arm/wrist/hand, do not reflect his condition had changed. For example, in September 2007, one treating doctor noted in the records that Farr had a limited range of motion in his wrist and hand. (Tr. 154). Moreover, on January 26, 2009, the records reflect that when Farr was seen in the ER, he complained that he had been experiencing drainage at his wrist over the last six (6) months and the nurse noted that she observed a "purulent discharge" coming from his wrist. (Tr. 210).

## 2.  The Consultative Physician

In late 2008, Farr was seen by Dr. Eric Roberson, a doctor specializing in internal medicine, for a consultative examination. (Tr. 193-198). As detailed in Dr. Roberson's report, which was completed in late 2008, Farr's chief complaints were associated with the problems with

---

[8] The Court pauses to note that the records do reflect that Farr was seen in the ER on July 5, 2005, and again on July 16, 2006, however, each visit was due to lesions and/or infections caused by insect bites. (Tr. 274-280; 264-272).

his right arm/hand, neck and lower back. (Tr. 193). Farr explained that his recovery had reached

a plateau, however, he still experienced significant pain and weakness in his upper extremity, as

well as neck pain. Farr also stated that he experienced lower back pain. (Tr. 193-194). During

the visit, Farr was asked about his "activities of daily living." According to the report, Farr told

Dr. Roberson that he could do the following:

> comfortably carry approximately 20 pounds in the right hand and more if
> he is using his left hand. He is able to do most simple tasks such as
> cooking, light cleaning, shopping and self hygiene. The claimant is right
> hand dominant. Prolonged walking and standing increase the lower back
> pain. Likewise repetitive bending, stooping, and squatting increase the
> lower back pain.

(Tr. 194). Dr. Roberson then examined Farr and, in his report, he detailed his findings as

follows:

> **Back:**
> No significant scoliosis or lordosis. No appreciable kyphosis. There is no
> spine or costovertebral angle tenderness. Claimant is able to squat and
> arise from a squatting position, and to bend and touch fingertips to within
> 8 inches of the floor without difficulty. Cervical spine in [sic] non-tender.
> Thoracic spine is non-tender. Lumbar spine is non-tender and non-
> spasmodic.
> **Extremities:**
> No clubbing, cyanosis, or edema. Calves were non tender. Homan's sign
> was negative. Pulses: Radial, Posterior Tibial and Dorsalis Pedis pulses are
> $2+$ and equal.
> - Right arm: This is an 8 cm scar to the ventral distal forearm.
>   Posterior elbow there is a 9 cm well-healed surgical scar.
> - Right hand: The index thru little fingers are not able to be fully
>   extended. The middle thru little fingers PIP's are affected the most
>   and essentially contracted at $60°$, $90°$ and $90°$ respectively. The
>   DIP's of the index thru little fingers lack full extension; $10°$, $30°$,
>   $30°$, $10°$ respectively. The thumb range of motion is relatively well
>   preserved.
> - Right elbow: Lacks full extension by $10°$. Flexion $= 110°$,
>   supination $= 30°$, pronation $= 90°$.

(Tr. 195-196).[9]   Dr. Roberson also ordered x-rays of Farr's forearm and lumbar spine.  (Tr. 196).  The x-rays of Farr's forearm revealed that the hardware was stable and that there was no "new acute bony abnormality" (Tr. 197); and the lumbar x-rays were noted to be "[u]nremarkable . . . with the exception of straightening of the lumbar lordosis."  (Tr. 198).  Dr. Roberson documented his diagnostic impressions, which were largely consistent with that of Farr's treating doctors, as follows:  1.  Right ulnar/radius fracture status post ORIF; 2. Right hand/finger contractures; 3. Decreased right elbow range of motion; and 4. lower back pain.  (Tr. 196).

### 3.  The ALJ's Determination

Based on the medical facts contained in the administrative record, the ALJ determined that Farr's "post surgical upper extremity fracture" was a severe impairment, but that Farr's claimed neck and back pain "imposed no more than a slight limitation on his ability to work" and, therefore was not considered to be a "severe" limitation.  (Tr. 40).  Based on the medical facts contained in the administrative record, the Court finds ample evidence exists to conclude that this factor weighs in favor of the ALJ's determination.

### B.  Subjective Complaints

The next element to be weighed is the subjective evidence of pain.  Careful consideration must be paid to this element because not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook v. Heckler,* 750 F.2d

---

[9] When describing the anatomy of the fingers, one source explains that '[t]he finger joints work like hinges when the fingers bend and straighten. The main knuckle joint is the metacarpophalangeal joint (MCP joint).  It is formed by the connection of the metacarpal bone in the palm of the hand with the finger bone, or phalange.  Each finger has three phalanges, separated by two interphalangeal joints (IP joints). The one closest to the MCP joint (knuckle) is called the proximal IP joint (PIP joint).  The joint near the end of the finger is called the distal IP joint (DIP joint)."  Http://www.eorthopod.com/content/pip-joint-injuries-finger.

391, 395 (5ᵗʰ Cir. 1985). The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. *See Ripley*, 67 F.3d at 556. In addition, any statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. For pain to rise to the level of disabling under the SSA, it must be "'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5ᵗʰ Cir. 1990) (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5ᵗʰ Cir. 1988)).

In addition, in applying these standards, the ALJ is required to make affirmative findings regarding claimant's subjective complaints. *Falco v. Shalala*, 27 F.3d 160, 163 (5ᵗʰ Cir. 1994). This naturally includes an assessment of the claimant's credibility for which the ALJ is entitled to considerable deference. *See id.* at 164 n. 18 (recognizing that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand); *see also*, *Chambliss v. Massanari*, 269 F.3d 520, 522 (5ᵗʰ Cir. 2001) (acknowledging that the ALJ is entitled to considerable deference in this finding); *Scott v. Shalala*, 30 F.3d 33, 35 n. 2 (5ᵗʰ Cir. 1994) (same).

In the present case, the ALJ had the opportunity to observe Farr first-hand at the administrative hearing on August 5, 2009. At the hearing, Farr testified that he is right-hand dominant. (Tr. 12). He explained that he was involved in an accident in 2003 in which his right arm/hand/wrist sustained a complex fracture. (Tr. 13). Farr acknowledged that after the injury,

he returned to work, but he explained that he not able to do the work he previously performed –
framing. (Tr. 14). Instead, Farr explained that from 2004-2006, he worked training others to
operate the equipment and then, after he did so, his employer let him go. (Tr. 14, 19). Farr
testified that he has not worked since his employer let him go.

The ALJ also heard Farr's testimony regarding his complaints of pain. (Tr. 11-23). In
particular, Farr testified that there is a hole in his wrist that drains all the time. (Tr. 16-17). He
testified that in the past two years, he couldn't use his arm/hand/wrist at all (Tr. 15-16) and that
the pain in his right shoulder prevents him from lifting and/or raising his arm. (Tr. 16, 18). Farr
also testified that he experiences pain in his shoulder and his upper and lower back and he rates
the pain as an "8" on a 10-point scale. (Tr. 20). Farr testified that due to the pain in his back he
has to lie down twice a day for about an hour. (Tr. 22). Despite the level of pain that he
experiences, Farr testified that he didn't take any kind of medication to alleviate the pain because
he "can't afford it." (Tr. 20). However, when questioned, he did concede that he receives
medical treatment for free because he is indigent. (Tr. 20-21). Finally, in describing his daily
activities, Farr testified that he is able to do simple tasks around his home which include cooking,
light cleaning and self-hygiene. (Tr. 17). A review of the ALJ's decision indicates that he
considered objective and subjective indicators related to the severity of Farr's pain. However,
having observed Farr, having listened to his testimony and having reviewed his medical records,
the ALJ concluded that Farr's complaints of pain were not entirely credible. In making his
determination, the ALJ noted Farr's subjective complaint of pain, particularly with regard to his
neck and back, were not consistent with the other evidence in the record. (Tr. 195-196). *See*
*Dunbar v. Barhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128) (an ALJ may

18

discount subjective complaints of pain as inconsistent with other evidence in the record).  The ALJ also pointed out that Farr was not taking any medication for the pain and, despite his contentions that he was unable to pay for care, the ALJ noted that Farr had access to and, in fact, received medical treatment at no cost to him.

While the Court has no reason to doubt that Farr suffers from pain, the mere fact that working may cause a claimant pain or discomfort, as a matter of law, does not mandate a finding of disability.  *See Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C.Cir. 1986).  Accordingly, the Court concludes that this factor weighs in favor of the ALJ's determination.

## C.  Educational Background, Work History and Age

The final element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

### 1. Residual Functional Capacity

The Social Security regulations define residual functional capacity (RFC) as the maximum degree to which the individual retains the capacity for sustained performance of the physical and mental requirements of jobs.  20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c).  The RFC evaluation is an assessment of an individual's ability to do sustained, related physical and mental activities in a work setting on a regular and continuing basis.  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A claimant's RFC represents the individual's maximum remaining ability to do

19

sustained work activities in an ordinary work setting on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1). RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most. Further, "[a] regular and continuing basis means 8 hours a day, for 5 days a week, or the equivalent work schedule." *Hector v. Barnhart*, 337 F.3d 905, 924 (S.D. Tex. 2004).

An ALJ has the responsibility for determining an applicant's RFC. 20 C.F.R. § 404.1546; *see also*, *Ripley*, 67 F.3d at 557. The ALJ's determination is reached through a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988); *see also*, SSR 96-8p, 1996 WL 374184 (July 2, 1996). "Usually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing[,] but "[t]he absence of such a statement . . . does not, in itself, make the record incomplete." *Ripley*, 67 F.3d at 557; *see also*, 20 C.F.R. 1513.(b)(6) ("...the lack of the medical source statement will not make the report incomplete."); *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (the decision to order a medical source statement or to obtain additional evidence is discretionary). When no medical statement of a claimant's residual functional capacity is provided, the court must focus on whether the Commissioner's decision is supported by substantial evidence in the existing record. *Ripley*, 67 F.3d at 557.

In the present case, there are no medical statements from Farr's treating doctors or from the consultative examiner concerning his residual functional capacity. Nevertheless, the administrative record does contain two opinions – both based on "paper reviews" – regarding Farr's residual functional capacity. (Tr. 199-206; 234-241). The first assessment was completed

by Dr. Scott Spoor, M.D. on December 1, 2008.  (Tr. 199-206).  Based on his review of the records, which included the consultative examiner's report that detailed Farr's account of his activities of daily living, this reviewer determined that Farr's allegations that he was disabled were only "partially credible" and that, in his opinion, Farr's exertional limitations consisted of the following: occasionally lifting/carrying 20 pounds; frequently lifting/carrying 10 pounds; sitting, standing and/or walking about 6 hours in an 8-hour workday; and "limited," but frequent, pushing and pulling.  (Tr. 200).  The examiner opined that there were no postural limitations, no visual limitations, no communicative limitations and no environmental limitations.  (Tr. 201-203).  In terms of manipulative limitations, the examiner opined that Farr had no limitations reaching in all directions (including overhead) or with feeling (skin receptors), but that he would be limited to "frequent" handling (gross manipulation) and fingering (fine manipulation).  (Tr. 202).

After Farr received additional medical treatment, a second "paper review" was completed on March 5, 2009, by Yvonne Post, D.O.  (Tr. 234-241).  This reviewer noted that Farr went to ER on January 26, 2009, "due to statement of right wrist has drainage [sic] for past 6 months," however,  based on her review of these records, she noted that the "ce [sic] in file did not show any drainage on the wrist."  (Tr. 241).[10]  Thus, after considering the medical records provided to her, this reviewer's assessment substantially mirrored the previous evaluation with the exception that she opined that Farr had an unlimited ability to push and/or pull.  (Tr. 235).

---

[10] The Court admits that it is confused by the reviewer's comment and might question the thoroughness of her review of the records because the nurse's notes from this visit appear to reflect a "purulent discharge" coming from Farr's wrist.  (Tr. 210).

Based on these "paper review" assessments and Farr's own statements concerning his abilities,[11] the ALJ determined that Farr retained the ability to perform a "full range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b)." (Tr. 41).[12] The Court is certainly aware that it is within the ALJ's province to determine RFC, however, it is not convinced that substantial evidence exists in the record upon which to support his determination for two reasons. First, while it is clear, based on Dr. Roberson's report, that Farr stated that he could "carry" twenty pounds with his right hand, a person's ability to "carry" is not the same as a person's ability to lift and/or grasp. Notably, the record reflects that Farr, who is right-hand dominant, has a fairly severe clawing of this hand and intrinsic contracture;[13] however, there is no indication from any medical provider who actually saw Farr whether he was able to reach objects, handle objects, or push or pull objects with the right hand. (Tr. 158; 195-196).

Second, while it is clear that the ALJ relied upon the assessments of the medical providers who completed the "paper reviews," he failed to incorporate consideration of Farr's reduced manual dexterity when determining RFC. *See Loza*, 219 F.3d at 395 (an ALJ is entitled to resolve conflicts in medical evidence and make decisions regarding credibility, but he is not entitled to

---

[11] During the consultative examination, which occurred in December 2008, Farr told the examiner that he could carry 20 pounds with his right hand and more if he used his left. (Tr. 194).

[12] Under these provisions, "light work" is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional factors such as loss of fine dexterity or inability to sit for long period of time." 20 CFR §§ 404.1567(b) and 416.967(b).

[13] *Supra* note 7.

make medical judgments); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (ALJ's are lawyers without medical expertise and, although schooled about the regulations, they are not empowered to rely on their "lay intuitions about medical phenomena").

For these reasons, the Court is simply not convinced that substantial evidence exists in the record to support the ALJ's determination of Farr's RFC. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (an ALJ "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").

### 2. Education, Work History, Age

The record shows that Farr was 46 years old at the time of the administrative hearing, he had been enrolled in special education classes at school, that he only completed school through the eighth grade, that he was illiterate, and that he had past relevant work experience as a maintenance worker and framer. The record reflects that the ALJ properly considered these factors.

### 3. The Role of the Vocational Expert

The ALJ must determine whether substantial gainful work exists for a claimant given his RFC. To assist him in making this determination, the ALJ normally seeks the aid of a vocational expert (VE). "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

In the present case, the ALJ questioned VE Wallace Stanfill about Farr's ability to do his past work and his ability to engage in other gainful work activities. The VE classified Farr's past

relevant work as involving both heavy, unskilled work and testified that, due to exertional limitations, he would not be able to return to his past relevant work. (Tr. 23). Proceeding on, and based on his determination that Farr had the residual functional capacity for light, unskilled work without restriction, the ALJ questioned a VE about the type of jobs existing in significant numbers in the national economy that could be performed by a claimant of the age, education and work experience of Farr. The VE testified that jobs existed and included a job as a construction flagger, a delivery driver, and an assembly press operator. (Tr. 28, 44). Thus, relying on the VE's testimony, the ALJ determined that the jobs existed that Farr could perform and, as such, he was not disabled. (Tr. 45).

Farr maintains that the ALJ's determination is fatally flawed because there a direct conflict exists between the VE's testimony concerning the jobs he would be able to perform and the Department of Occupational Titles (DOT).[14] This argument has merit. Having reviewed the record, a direct conflict does exist between the VE's testimony that Farr could work as a delivery driver despite his inability to read and write, and the DOT which describes such jobs as requiring at least some level of literacy. (Dkt. No. 14, Ex. A[15]). A direct conflict also exists between the VE's testimony that a person such as Farr could perform the job of assembly press operator,

[14] The DOT was promulgated by the Department of Labor to provide "standardized occupational information to support job placement activities." *See Dictionary of Occupational Titles* at xv (4th ed. 1991). The DOT, along with a companion volume – *The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO")–contains descriptions of the requirements for thousands of jobs in the national economy.

[15] The descriptions for the different delivery driver positions require the individual to be able to record transactions on customer receipts, write customer orders and instructions, record sales or delivery information on daily sales or delivery records, prepare order forms and sales contracts, and/or maintain driving logs.

which, according to the DOT is a job that requires frequent reaching, handling, fingering, when his bilateral manual dexterity was reduced and his dominant right hand impaired. (*Id.*).

As set forth in the SSA's regulations, "[w]hen vocational evidence provided by [an expert] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the [ ] evidence to support a determination or decision that the individual is or is not disabled." SSR 00-4p, 2000 WL 1898704 at *4 (2000). If the conflict is resolved in favor of the VE, the ALJ must articulate a "plausible" reason for accepting testimony that conflicts with the DOT so that the hearing decision is susceptible to meaningful judicial review. *Conaway v. Astrue*, 2008 WL 4865549 at *7 (N.D. Tex. 2008). In the present case, the ALJ failed to articulate any reason for disregarding the DOT's literacy requirements for the job of delivery driver; and the fingering requirements for the job of assembly-press operator. As a result, the Court must conclude that the Commissioner has not satisfied its burden of demonstrating that substantial gainful work which exists in the national economy substantial that Farr can perform. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (decision must stand or fall with reasons set forth by the ALJ). Accordingly, this factor weighs against the ALJ's decision.

## Conclusion

Considering the record as a whole, this Court concludes that proper legal standards were not adhered to and the Commissioner's decision is not supported by substantial evidence. The Court, therefore, concludes that the Defendant's Motion for Summary Judgment (Dkt. Nos. 12, 13) is **DENIED**; that Plaintiff's Motion for Summary Judgment (Dkt. No. 11) is **GRANTED**; and

that this action be **REMANDED** to the Social Security Administration pursuant to Sentence 4 of

42 U.S.C. § 405(g), for further proceedings consistent with the determinations made herein.

    **DONE** at Galveston, Texas, this _____ 30th _____ day of November, 2012.

                            JOHN R. FROESCHNER

                            UNITED STATES MAGISTRATE JUDGE